UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
ATLAS PARTNERS, LLC, f/k/a CROWN      :
PARTNERS, LLC,                        :
                                :
           Plaintiff,          :      14 Civ. 7134 (VM) (FM)
                                :
            v.                :
                                :
STMICROELECTRONICS INTERNATIONAL   :
N.V.,                                 :
                                :
           Defendant.       :
                                :
-------------------------------------------------------- x

**DEFENDANT STMICROELECTRONICS INTERNATIONAL N.V.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

SIDLEY AUSTIN LLP
John J. Kuster
Benjamin F. Burry
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant
STMicroelectronics International N.V.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND...................................................................................................2

      I.      The Parties .................................................................................................2
      II.     The Master Services Agreement .................................................................3
      III.    The Statement of Work ..............................................................................4
      IV.    The 2011 Amendment to the SOW...............................................................6
      V.     Payments ....................................................................................................8
      VI.    ST Chooses Not to Renew the SOW ..........................................................8

ARGUMENT .........................................................................................................................10

      I.      PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST
             BE DISMISSED ........................................................................................10

            A.     Plaintiff's Breach of Contract Theory is Precluded by the
                   Plain Language of the SOW and the Amendment .....................................12

      II.     PLAINTIFF'S UNJUST ENRICHMENT CLAIM MUST
             BE DISMISSED ........................................................................................18

CONCLUSION.......................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Acme Supply Co., Ltd. v. City of N.Y.*,
  39 A.D.3d 331 (1st Dep't 2007) ..........................................................................11

*Anwar v. Fairfield Greenwich Ltd.*,
  831 F. Supp. 2d 787 (S.D.N.Y. 2011),
  aff'd sub nom. *Pujals v. Standard Chartered Bank*, 533 F. App'x 7 (2d Cir. 2013)................3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................10

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
  301 A.D.2d 70 (1st Dep't 2002) ........................................................................13

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)...................................................................................3

*DLJ Mortg. Capital Inc. v. Home Loan Corp.*,
  667 F. Supp. 2d 368 (S.D.N.Y. 2009).................................................................17

*Eastman Kodak Co. v. Altek Corp.*,
  936 F. Supp. 2d 342 (S.D.N.Y. 2013).................................................................14

*Georgia Malone & Co., Inc. v. Rieder*,
  86 A.D.3d 406 (1st Dep't 2011) ........................................................................18

*Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*,
  273 F.3d 509 (2d Cir. 2001)...............................................................................18

*Goldstein v. CIBC World Markets Corp.*,
  6 A.D.3d 295 (1st Dep't 2004) ..........................................................................18

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
  74 A.D.3d 413 (1st Dep't 2010) ........................................................................15

*James v. Jamie Towers Hous. Co.*,
  294 A.D.2d 268 (1st Dep't 2002), *aff'd*, 99 N.Y.2d 639 (2003) ...........................11

*Jasper & Black, LLC v. Carolina Pad Co., LLC*,
  No. 10 CIV. 3562 LTS HBP, 2012 WL 413869 (S.D.N.Y. Feb. 9, 2012) ..............17

*Kamfar v. New World Rest. Grp., Inc.*,
    347 F. Supp. 2d 38 (S.D.N.Y. 2004) ...................................................................10

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    No. 14-CV-2197 VM, 2014 WL 4447298 (S.D.N.Y. Aug. 27, 2014) ....................19

*Mfrs. & Traders Trust Co. v. Erie Cnty. Indus. Dev. Agency*,
    269 A.D.2d 871 (4th Dep't 2000) .........................................................................11

*Pujals v. Standard Chartered Bank*,
    533 F. App'x 7 (2d Cir. 2013) ..................................................................................3

*R.H. Damon & Co. v. Softkey Software Prods., Inc.*,
    811 F. Supp. 986 (S.D.N.Y. 1993) .......................................................................17

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
    98 N.Y.2d 29 (2002) .......................................................................................10, 11

*Schnall v. Marine Midland Bank*,
    225 F.3d 263 (2d Cir. 2000) .....................................................................................3

*Schultz v. Gershman*,
    68 A.D.3d 426 (1st Dep't 2009) ...........................................................................18

*Sharper Props. Enters., Inc. v. Hubbard Sand & Gravel, Inc.*,
    12 A.D.3d 494 (2d Dep't 2004) ............................................................................11

*Steinberg v. Schnapp*,
    73 A.D.3d 171 (1st Dep't 2010) ...........................................................................11

*Verzani v. Costco Wholesale Corp.*,
    641 F. Supp. 2d 291 (S.D.N.Y. 2009)
    *on reconsideration* (Aug. 6, 2009), *aff'd*, 387 F. App'x 50 (2d Cir. 2010) ...........11

## RULES

Fed. R. Civ. P. 12(b)(6) ..................................................................................1, 10

## OTHER AUTHORITIES

Restatement (Second) of Contracts § 253(2) ............................................................13

Defendant STMicroelectronics International N.V. ("ST" or "Defendant") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint (the "Amended Complaint" or "Am. Compl.") filed by Plaintiff Atlas Partners, LLC f/k/a Crown Partners, LLC ("Plaintiff" or "Crown"),[1] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In 2008, ST hired Crown to develop its website and provide related consulting services. The relationship continued and, in 2011, ST outsourced the hosting of its web content platform to Crown. The parties' agreement originally provided that, after an initial planning phase, Crown would provide ten (10) quarters (*i.e.*, 30 months) of hosting services—from first quarter ("Q1") 2012 through Q2 2014—in exchange for ten (10) "quarterly up-front" payments of $438,000, each due before the first day of the upcoming quarter. However, delays during the initial planning phase caused the parties to later sign an amendment to their agreement that pushed the schedule pursuant to which Crown provided ST with hosting services back by one quarter—so that it ran from Q2 2012 through Q3 2014.

In early 2014, ST selected a new website partner and informed Crown that ST would not renew the hosting contract when it expired at the end of Q3 2014. Crown responded with threats to terminate its services to ST as of June 30, 2014, the end of Q2 2014, rather than perform the contractually required services to be provided through Q3 2014. Remarkably, Crown took the position that while the amendment pushed back ST's payment obligations so that ST must pay for ten quarters of service through Q3 2014, the amendment meant that Crown only needed to perform nine quarters of service, *i.e.* through Q2 2014. Crown claimed it was entitled

---

[1] Plaintiff's Amended Complaint avers that Plaintiff Atlas Partners, LLC was "formerly known as Crown Partners, LLC". (Am. Compl. ¶ 2). For ease of reference, Plaintiff will be referred to as "Crown" herein.

to $438,000 as a purported "Final Payment," even though it was refusing to provide the required tenth quarter of Q3 2014 hosting services.

Now Plaintiff has commenced this action, claiming that it is entitled to a $438,000 "Final Payment" for services Crown never performed. Plaintiff asserts two causes of action: for breach of contract and unjust enrichment. Both claims should be dismissed.

First, Plaintiff has not met its burden to allege a claim for breach of contract. Plaintiff's claim is premised on a fundamental misreading of the contract that would give Crown a right to quarterly payment even when Crown refuses to provide hosting services. ST breaches no duty by not paying a fictional "Final Payment" as Crown alleges, rather than a "quarterly, up-front" recurring service fee to be paid in exchange for contractually mandated services that Crown emphatically announced it would not provide before the final Q3 2014 payment was due.

Second, Plaintiff's unjust enrichment claim cannot possibly survive because it is duplicative of its breach of contract claim and barred by the existence of a contract between the parties. Both of Crown's claims lack merit and fail as a matter of law. Accordingly, ST respectfully submits the Amended Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

### I.      The Parties

ST is a semiconductor and electronics manufacturer headquartered in Geneva, Switzerland. Am. Compl. ¶ 3. To improve the delivery of services to its customers, to increase its customer base, and to maintain and grow its market share in the highly competitive semiconductor and electronics industries, ST sought to work with a sophisticated web solutions company that could implement ST's vision of a dynamic, comprehensive, and easy-to-use website for its customers and the general public (the "Website"). Developing such a website was especially critical for ST because its customers—leading manufacturers that rely on ST's

products for use in complex products ranging from satellites to wireless devices to medical equipment—require instantaneous, consistent access to datasheets, schematics, models, and software.

Plaintiff is a Dayton, Ohio limited liability company that provided various web-related services to ST, pursuant to the Master Services Agreement (the "MSA") entered into between the parties on or about December 17, 2008.  Am. Compl. ¶¶ 6-7.[2]

## II.    The Master Services Agreement

The MSA provides the basic structure of the parties' contractual relationship, with the details of Crown's services under the MSA to be laid out in one or more mutually agreed-upon Statements of Work.  Am. Compl. ¶¶ 7, 10.

Section 3 of the MSA addresses "Payment for Services."  It provides that "[ST] agrees to pay [Crown] in the amounts, at the rates, and on the terms set forth in each Statement of Work.  If no payment terms are set forth in a Statement of Work, then the following terms shall apply."  Ex. A § 3.  Among these terms are that "the period covered by each invoice shall commence on 1st day of one month and end on the last day of the same month" and that "[ST] shall pay [Crown] within thirty (30) days of [ST]'s receipt of the invoice, *provided that the invoice is submitted in accordance with the milestones or other schedule set forth in this Agreement or the applicable Statement of Work*."  *Id.* (emphasis added).  In other words, the

---

[2] *See also* Ex. A (the MSA).  Exhibit references are to exhibits to the accompanying Declaration of Benjamin F. Burry ("Burry Declaration").  In deciding a motion to dismiss, the Court may consider any document referenced in the complaint as well as "any documents that are integral to the complaint, meaning that the complaint relies heavily upon the documents terms and effect, and the plaintiff has actual notice of all the information in the documents and relied upon those documents in framing the complaint."  *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 791 (S.D.N.Y. 2011) (Marrero, J.) (internal marks omitted) aff'd sub nom. *Pujals v. Standard Chartered Bank*, 533 F. App'x 7 (2d Cir. 2013); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-47 (2d Cir. 1991); *Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000) (considering a cardholder agreement, account history, and monthly statements offered on a motion to dismiss because those documents "are integral to [plaintiff's] claims and [plaintiff] had notice of that information").  Moreover, here Crown has attached the MSA and certain other exhibits to its original complaint in this action, *see* Dkt. Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6.

MSA contemplates an ongoing relationship whereby each month ST receives an invoice that corresponds to that month's milestones or scheduled work performed by Crown.

### III.    The Statement of Work

Under the MSA, the parties entered into statements of work that established the terms upon which Crown would provide ST specific services and work product.  Ex. A § 2; Am. Compl. ¶ 10.

In 2011, ST wished to outsource hosting of its web content management system ("WCMS") platform, including physical hosting of the hardware and software infrastructure along with the creation of a hosted WCMS center.  ST and Crown formalized the outsourcing agreement by executing the WCMS Platform Hosting and Management Outsourcing Statement of Work (the "SOW"), dated July 29, 2011.[3]  The SOW requires Crown to create and host an appropriate WCMS platform, provide application and software support, and provide support for any changes to items such as functionality, templates, or any other item that would impact the cost model.  Ex. B at 5.

The "Initial Term" of the SOW was a 36-month period, which was to begin retroactively on July 1, 2011 and run through June 30, 2014 (*i.e.*, the end of Q2 2014).  Ex. B at 29; Am. Compl. ¶ 12.  The first two quarters of the Initial Term (Q3 and Q4 2011) were a planning period for Crown to make the necessary preparations to assuming the hosting responsibilities.  *See, e.g.*, Ex. B at 3-4.  Crown's actual hosting services would begin Q1 2012 and continue through the end of Q2 2014.  *Id.*

Once actual hosting service began, ST would pay a monthly service fee of $146,000 per month, or $438,000 per quarter.  *Id.*; Am. Compl. ¶ 15.  The SOW makes clear that

---

[3] The SOW is attached to the Burry Declaration as Exhibit B.  Additionally, Plaintiff appended a copy to its original complaint.  *See* Dkt. No. 1-3.

these fees cover ongoing services Crown was to provide for ST. *See* Ex. B at 28 ("Fees include Crown services . . . and application support, as well as fees for Crown hosting.").  The parties agreed that ST would not begin paying the servicing fees until Crown started delivering the hosting services.  *See* Ex. B at 4 ("Pricing for the Crown-hosted solution is $146,000 per month when Crown begins delivering the Hosted Service, which will initiate on or before January 1 2012, pending acceptance.").  The servicing fees for the first two quarters of service (Q1 and Q2 2012) would be paid at the initiation of service.  *Id.*  Crown would thereafter invoice ST, and ST would pay Crown, the hosting service fees on a "quarterly, up-front" basis through Q2 2014.  *Id.* The parties set out this payment arrangement as follows, and with an accompanying table, both of which are copied below:

Pricing for the Crown-hosted solution is $146,000 per month when Crown begins delivering the Hosted Service, which will initiate on or before January 1 2012, pending acceptance.  Crown will invoice STM for six-months of service at the initiation of the service and then quarterly, up-front going forward:

Table 1 Summary Crown Fees

| ST.com WCMS COE Outsourcing Fees | Q3 '11 | Q4 '11 | Q1 '12 | Q2 '12 | Q3 '12 | Q4 '12 |
|---|---|---|---|---|---|---|
| Total Fees | $0 | $0 | $438,000 | $438,000 | $438,000 | $438,000 |
| Payment Schedule | | | $876,000 | | $438,000 | $438,000 |

| ST.com WCMS COE Outsourcing Fees | Q1 '13 | Q2 '13 | Q3 '13 | Q4 '13 | Q1 '14 | Q2 '14 |
|---|---|---|---|---|---|---|
| Total Fees | $438,000 | $438,000 | $438,000 | $438,000 | $438,000 | $438,000 |
| Payment Schedule | $438,000 | $438,000 | $438,000 | $438,000 | $438,000 | $438,000 |

Ex. B at 4.[4]

The SOW provided for automatic renewal after the Initial Term.  If ST wished to cancel the SOW upon the conclusion of the Initial Term, it had to provide at least 120 days' notice prior to the end of Initial Term.  Am. Compl. ¶ 13; Ex. B at 31.  Otherwise, the SOW would automatically renew on a year-to-year basis.  *Id.*

---

[4] An identical schedule is set forth in Table 13 of the SOW, which provides the "Hosting Plan (Payment Schedule)" indicating payments were due "on the first day of the first month *for the upcoming period*," Ex. B at 29 (emphasis added).

IV.     **The 2011 Amendment to the SOW**

ST and Crown executed an amendment to the Statement of Work of August 24, 2011 (the "Amendment"), dated as of December 5, 2011.[5]  Am. Compl. ¶ 17.

The parties set forth their understanding of the changes to the performance and payment schedule in Section 2 of the Amendment:

**Section 2**

The payments to be due by ST to Consultant during the first quarter of 2012 and defined in the Table 1 "Summary Crown Fees" page 4 and Table 13, page 29 of the SOW are replaced by the following provisions:

| Event | Amounts | Conditions |
|---|---|---|
| Delivery of Test and Integration platform expected in January 2012 | First installment of US$219.000 | Advance payment made by ST subject to completion and acceptance of the relevant deliverables as provided below |
| Acceptance of the relevant Deliverables for Go-Live, expected on or before May1st 2012 provided that delivery of the relevant deliverables by Crown Partners to ST takes place at the latest on April 1, 2012. | Second installment of US$657.000 | Subject to completion and acceptance of the relevant deliverables as defined in Section 3 hereinafter and its relevant Appendix. The beginning of Services will occur when the Go-Live deliverables will have been accepted. |
| Calendar Q2/12 | US$0 | Already covered by Go-Live Prepayment |
| Calendar Q3/12 | US$0 | Already covered by Go-Live Prepayment |
| Calendar Q4/12 | US$438.000 | Recurring service fee |
| Calendar Q1/13 | US$438.000 | Recurring service fee |
| Calendar Q2/13 | US$438.000 | Recurring service fee |
| Calendar Q3/13 | US$438.000 | Recurring service fee |
| Calendar Q4/13 | US$438.000 | Recurring service fee |
| Calendar Q1/14 | US$438.000 | Recurring service fee |
| Calendar Q2/14 | US$438.000 | Recurring service fee |
| Calendar Q3/14 | US$438.000 | Recurring service fee |

Ex. C § 2; Am. Compl. ¶ 18.

In the Amendment, the parties extended the initial planning period by one quarter and postponed the commencement of actual hosting services by one quarter.  The extension of the initial planning period was memorialized in the parties' agreement that "[t]he beginning of Services will occur when the Go-Live deliverables will have been accepted."  Ex. C § 2. Because ST's acceptance of the Go-Live deliverables was not expected until well into Q2 2012 (*i.e.*, May 1, 2012), the initial planning period necessarily could not have concluded in Q1 2012.

---

[5] The Amendment is attached to the Burry Declaration as Exhibit C.  Additionally, Plaintiff appended a copy to its original complaint.  *See* Dkt. No. 1-4.

The parties then made a corresponding one-quarter postponement in the

commencement of the hosting services.  In Section 2, the "Conditions" make clear that the

payments for the Q2 2012 and Q3 2012 "Event[s]" were "[a]lready covered by Go-Live

Prepayment."  Ex. C § 2.  Because the initial payment of $876,000, which covers six months of

services, had been expedited, that amount was credited to the first two quarters of actual hosting

services.  Notably, this initial payment mechanism is consistent with what was originally

contained in the SOW.

Finally, the Amendment expressly extended the period of the hosting services by

creating a new "Event" for Q3 2014 and conditioning the hosting services for that additional

quarter on the payment of another $438,000 "[r]ecurring service fee."  Ex. C § 2.  Section 4 of

the Amendment reads:

> Terms and conditions set out in this Amendment are deemed to amend and
> replace relevant terms in the Agreement, where applicable.  All other
> terms and conditions of the SOW shall remain unmodified and in full
> force and effect.  This Amendment shall be deemed to constitute a part of
> the SOW and the Agreement."

Ex. C § 4.  Although Section 2 replaced Tables 1 and 13 in the SOW and shifted the services to

be provided to Q3 2014, it did not purport to modify the language that precedes the tables.

Hence, the conditions in the SOW that servicing fees are on a "quarterly, up-front" basis, Ex. B

at 4, and "due on the first day of the first month for the upcoming period," Ex. B at 29,

"remain[ed] unmodified and in full force and effect" per Section 4 of the Amendment.  Ex. C §

4.  Nothing in the SOW or Amendment provided for a "Final Payment" without the concomitant

obligation to provide services for the next quarter.  The Section 2 table plainly provides for an

identical "[r]ecurring service fee" all eight quarters from Q4 2012 to Q3 2014, and, accordingly,

Q3 2014 must be read to constitute payment for upcoming services from Crown.  In light of the

fact that the Section 2 table expressly extended Crown's "[r]ecurring service" obligations under the SOW through Q3 2014, the "Initial Term" clause is a "relevant term" and was accordingly amended and replaced so as to accommodate that extension. *Id.* at §§ 2, 4.

## V.     Payments

For the first nine invoices, Crown invoiced ST, and ST paid Crown, the agreed-upon servicing fees in accordance with Section 2 of the Amendment.  Am. Compl. ¶¶ 16-20.  For each recurring service fee, every invoice stated that it was "[p]ayable per Section 2 provisions of [the] Amendment," and that the $438,000 fee represented an "ST.com Outsourcing Fee" for the upcoming quarter.[6]  For example, Crown sent a September 1, 2012 invoice for "ST.com Outsourcing Fee – Q4 2012," Ex. D at 1, following by a December 1, 2012 invoice for "ST.com Outsourcing Fee – Q1 2013," Ex. D at 2, and so on, *see* Ex. D at 3-9.  The last undisputed invoice was dated February 26, 2014 and stated that it was "ST.com Outsourcing Fee – Quarter 2, 2014 covering the period from April 1, 2014 – June 30, 2014."  Ex. D at 9; *accord* Am. Compl. ¶¶ 8, 9, 16, 22 (describing invoices).  ST paid each of the nine invoices for the upcoming quarter of Crown's services.  Am. Compl. ¶¶ 19, 20.

## VI.    ST Chooses Not to Renew the SOW

In 2013, ST began to explore options for a new platform for its Website, and, after reviewing and considering the proposals, ST selected a different company to provide its Website services, and thus ST decided not to renew the SOW.  Accordingly, on February 24, 2014, ST wrote to Crown:

> According to the provisions of Section "Initial Term" of the Statement of Work [the SOW], which has been amended on January 10, 2012, this Statement of Work and relevant services will expire on September 30,

---

[6] The nine invoices Crown issued to ST pursuant to the Amendment that were paid by ST, *see* Am. Compl. ¶¶ 19, 20, are attached to the Burry Declaration as Exhibit D.  Plaintiff appended a copy to its tenth invoice to its original complaint.  *See* Dkt. No. 1-6.

2014.  We hereby inform you, in accordance with the provisions of Section "Renewal Policy" of this Statement of Work, that we do not want to renew the aforesaid Statement of Work.  Therefore, this Statement of Work and relevant services will expire, effective on September 30, 2014.[7]

Ex. E.

ST remained committed to working with Crown under the MSA, SOW, and the Amendment, and to a timely, seamless transition to the new web platform at the end of the Initial Term on September 1, 2014.  However, on March 1, 2014, Crown responded to ST's February 24, 2014 letter.  In its letter, Crown ignored the plain words of the SOW and the Amendment and, for the first time ever, made a written demand to ST to make a so-called "Final Payment." Am. Compl. ¶ 26.

On May 20, 2014, Crown sent an e-mail attaching an invoice, dated June 1, 2014, which purported to be "for the final period of service Q2 2014."[8]  Ex. F at 1; Am. Compl. ¶ 30. Notably, ST had already paid the "Q2 2014" recurring service fee, as per the prior invoice, dated January 27, 2014, which similarly stated that it was for "Managed Services – Technology Subscription / March 2014: ST.com Outsource Fee Q2 2014" and further described the payment as owed for "ST.com Outsourcing Fee – Quarter 2, 2014 covering the period from April 1, 2014 – June 30, 2013."  Ex. D at 9.  In fact, all recurring services invoices received up to that point stated that they were for the services to be provided for the upcoming quarter, in accordance with the express provisions of Section 2 of the Amendment.  *See* Ex. D at 2, 4-9.

In the e-mail by which Crown sent this invoice attempting to double-bill ST for Q2 2014 services, Crown threatened that "payment is due on or before July 1st to avoid stopping

---

[7] A copy of the February 24, 2014 cancellation letter is attached to the Burry Declaration as Exhibit E.  Additionally, Plaintiff appended a copy to its original complaint.  *See* Dkt. No. 1-5.

[8] A copy of Crown's May 20, 2014 e-mail and attached invoice is attached to the Burry Declaration as Exhibit F. Additionally, Plaintiff appended a copy of the invoice to its original complaint.  *See* Dkt. No. 1-6.

services." Ex. F at 1.  Nowhere in the Amended Complaint does Crown allege it was willing to continue to perform its obligations under the SOW and the Amendment through Q3 2014, even though those agreements unambiguously provide that the hosting services were to continue through Q3 2014.

## ARGUMENT

### I.  PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED

In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that well-pled factual allegations in the complaint are true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While detailed factual allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations and citations omitted).

"Under New York law," which applies here, *see* MSA § 16, "the initial interpretation of a contract is a matter of law for the court to decide" and "[w]here the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law."  *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 48-49 (S.D.N.Y. 2004) (internal footnote omitted).  "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002) (citation omitted).  Consequently, "where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language" and "evidence outside the four corners of the document is generally

inadmissible to add to or vary the writing." *Id.* at 32, 33 (internal modifications and citations omitted).

A court must embrace "[a]n interpretation that gives effect to all the terms of an agreement" rather than one that "ignores terms or accords them an unreasonable interpretation" or would otherwise "leave a provision of a contract without force and effect." *Acme Supply Co., Ltd. v. City of N.Y.*, 39 A.D.3d 331, 332 (1st Dep't 2007) (internal alterations and citations omitted). The court "must give the words and phrases employed their plain meaning." *Steinberg v. Schnapp*, 73 A.D.3d 171, 175 (1st Dep't 2010) (citation omitted). The contractual interpretation should "reasonably harmonize[]" the provisions of the contract and avoid inconsistencies. *James v. Jamie Towers Hous. Co.*, 294 A.D.2d 268, 269 (1st Dep't 2002) (citation omitted), *aff'd*, 99 N.Y.2d 639 (2003).

Where several instruments constitute part of the same transaction, they must be interpreted together. *Sharper Props. Enters., Inc. v. Hubbard Sand & Gravel, Inc.*, 12 A.D.3d 494, 495 (2d Dep't 2004). In interpreting multiple agreements, the court must reconcile any differences among them and give effect to the expressed intentions of the parties. *Mfrs. & Traders Trust Co. v. Erie Cnty. Indus. Dev. Agency*, 269 A.D.2d 871, 872 (4th Dep't 2000).

Where, as here, the contractual language unambiguously does not provide plaintiff the right sought to be enforced, dismissal of plaintiff's breach of contract claim is proper. *See Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009) ("There is no ambiguity about what appears [i]n the [contract], and the language there unambiguously does not promise [plaintiff] sixteen ounces of shrimp."), *on reconsideration* (Aug. 6, 2009), *aff'd*, 387 F. App'x 50 (2d Cir. 2010).

A.    **Plaintiff's Breach of Contract Theory is Precluded by the Plain Language of the SOW and the Amendment**

Plaintiff fails to allege breach of any duty because the plain language of the SOW and the Amendment simply do not contemplate a purported "Final Payment."  Am. Compl. ¶¶ 22, 25, 34.  Thus Plaintiff is seeking to enforce a purported right that plainly does not exist under the agreements and Plaintiff's interpretation must be rejected as a matter of law.

The terms of the parties' Agreement, including the amended payment schedule, are clear and unequivocal:  Crown was to provide services through the end of Q3 2014, and was never entitled to a "Final Payment" untethered from that obligation as Plaintiff wrongly alleges in its Amended Complaint.  Originally, Crown was to develop and prepare the Website for launch during the first six months of the Initial Term (Q3 and Q4 2011).  *See, e.g.*, Ex. B at 3-4.  The parties agreed that during this initial six month period, "no fee will be paid by STMiroelectronics to [Crown]."  *Id.* at 4.  After completing its preparations, Crown was to provide actual hosting services for the 30 months remaining in the Initial Term (10 quarters: Q1 2012 through Q2 2014).  *Id.*  The payment for the first two quarters of service (Q1 and Q2 2012) was to be made "at the initiation of the service," *id.* at 4.  All invoices and payments for the remaining 8 quarters of hosting services provided during the Initial Term would be made on a "quarterly, up-front" basis.  *Id.*

Section 2 of the Amendment unambiguously altered this performance schedule in three ways relevant here:

First, the parties agreed to extend the preparatory period by one quarter—through Q1 2012.  *See* Ex. C § 2 ("Acceptance of the relevant Deliverables for Go-Live, expected on or before May 1st 2012 provided that delivery of the relevant deliverables by Crown Partners to ST

takes place at the latest on April 1, 2012."); Ex. C at App. 1 (timeline providing that the targeted "Golive date" would be "[n]o later than May 1, 2012").

Second, due to the planned one-quarter delay in preparatory work at the beginning of the engagement as described in Section 2 of the Amendment, the parties agreed to make a corresponding one-quarter delay in commencing Crown's hosting services—accordingly, the hosting services would begin in Q2 2012 instead of Q1 2012.  *See Id.* at § 2 (showing that the service fees for Q2 and Q3 2012 are "[a]lready covered by Go-Live Prepayment") (emphasis added); Ex. B at 4 (providing that payment for the first six months of service would be made "at the initiation of the service").

Third, due to the planned one-quarter delays in the preparatory work period and the commencement of actual hosting services, the parties made an express corresponding change to the end of hosting services by adding a new "Event" for Q3 2014.  Ex. C § 2.  Notably, this "Event" did not appear anywhere in the original SOW.  By extending the hosting period to Q3 2014, the parties preserved the overall length—30 months (10 quarters)—for hosting services set forth in the SOW.

Notwithstanding the plain language of the SOW and the Amendment, in its correspondence with ST regarding its refusal to provide services for the "Event" of Q3 2014 pursuant to the Amendment, Crown apparently contends that the Initial Term remains unchanged and its obligations cease on June 30, 2014.[9]

---

[9] Further, Crown's unconditional refusal to perform its obligations under the agreements to provide services for Q3 2014 constitutes a repudiation of the MSA, SOW, and Amendment.  New York law plainly provides that Crown's repudiation discharges ST's responsibility to perform ST's end of the bargain.  As a matter of law, Crown cannot sue to recover on a contract that it has repudiated.  *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77 (1st Dep't 2002) ("a repudiation discharges the nonrepudiating party's obligations to render performance in the future"); Restatement (Second) of Contracts § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.").

Crown's allegations that the Q3 2014 recurring quarterly payment actually represents a "Final Payment" that was for services already rendered fails.  As a preliminary matter, the language of the agreements makes clear that the quarterly payments were to be credited to upcoming quarters.  The SOW unequivocally states that Crown would invoice the first six months of service (*i.e.*, two quarters) at the initiation of the service, and then "quarterly, up-front going forward."  Ex. B at 4 (emphasis added).  A later portion of the SOW confirms the prospective nature of the quarterly payments:  "Payments . . . are due on the first day of the first month for the upcoming period . . . ."  Ex. B at 29 (emphasis added).  These provisions mandating that payments were for upcoming quarter of services were not altered by the Amendment and therefore, according to the express terms of the Amendment, "shall remain unmodified and in full force and effect."  Ex. C § 4.

Nothing in the SOW or Amendment provided for a "Final Payment" without the concomitant obligation to provide services for the next quarter.  Indeed, the term "Final Payment" does not appear anywhere in the parties' Agreement, the SOW, or the Amendment.  For all eight quarters from Q4 2012 to Q3 2014, the Section 2 table plainly uses the identical term "[r]ecurring service fee" to describe the "Conditions" on ST's payment obligation.  It is a fundamental canon of construction that identical terms should be given the same meaning through a contract. *See, e.g.*, *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013) ("a Court 'may presume that the same words used in different parts of a writing have the same meaning'") (citation omitted).  Given that for Q4 2012 through Q2 2014 the "[r]ecurring service fee" is conditioned on Crown's service for the upcoming quarter, the Q3 2014 "[r]ecurring service fee"—for which the parties use identical language—must also be read to constitute payment for upcoming services from Crown.  To instead deem this a special "Final

Payment" where Crown is somehow exempt from its ordinary service obligations is contrary to basic principles of contact interpretation and should be rejected as a matter of law.

Crown's interpretation should also be rejected because it leads to the absurd result that ST would pay the quarterly servicing fee of $438,000 in Q3 2014 without receiving any services in return. *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (citation and internal quotation marks omitted).  Under Section 2 of the Amendment the parties agreed to delay the start of the hosting services to Q2 2012.  Section 2 of the Amendment also mandated that Crown was to provide ten quarters of hosting services.  Crown, however, contends that its hosting obligations end at the end of Q2 2014, which amounts to a total of nine quarters of hosting services (Q2 2012 through Q2 2014).  Neither logic nor the plain language of the SOW and the Amendment support an interpretation that would allow Crown to get "something for nothing."  The logical and natural reading of the SOW and the Amendment is that when the parties expressly agreed to delay the start of the hosting services by one quarter and made a corresponding one-quarter change to the end of the hosting services, as set out in Section 2 of the Amendment, the Initial Term clause was necessarily amended and revised, pursuant to Section 4 of the Amendment.  Crown's reading requires interpreting agreements that undisputedly establish a system of payments for future services to inexplicably provide for a final payment of $438,000 at the beginning of Q3 2014, even though, in Crown's reading, *no* services would be provided in Q3.  Such an untenable reading of the parties' agreements should be rejected.

In addition to running afoul of the plain language of the agreements, Crown's interpretation is belied by the invoicing and payment history described in the Amended

15

Complaint.  Am. Compl. ¶¶ 18-24.  In accordance with provisions in the agreements that

invoicing is to occur "up-front going forward" and "for the upcoming period," Ex. B at 4, 29,

every single quarterly invoice Crown sent to ST pursuant to Section 2 of the Amendment, up

through February 2014, states that the invoiced fees were for outsourced hosting services to be

provided in the <u>upcoming</u> quarter, not for services provided in the prior quarter, *see* Ex. D at 2,

4-9.  ST paid every single one of those invoices as they came due, and Crown never objected or

attempted to correct the notations appearing on all of the invoices.  *See* Am. Compl. ¶ 20 ("[ST]

made seven of the eight quarterly payments.").  Indeed, Crown never even suggested that the

quarterly payments were retroactive until after ST informed Crown that it had selected a different

partner for the new WCMS platform and was electing not to renew the SOW.

Finally, the agreements provide that ST breaches no duty by not paying the final

"quarterly, up-front" "[r]ecurring service fee" to Crown for services that Crown emphatically

announced it would not provide.  Section 3 of the MSA addresses "Payment for Services."  It

provides that "[ST] shall pay [Crown] within thirty (30) days of [ST]'s receipt of the invoice,

*provided that the invoice is submitted in accordance with the milestones or other schedule set*

*forth in this Agreement or the applicable Statement of Work*."  Ex. A § 3 (emphasis added).

While the SOW amended the invoicing schedule to provide for invoicing 30 to 45 days prior to

payment and that invoices "are due on the first day of the first month for the upcoming period,"

Ex. B at 29, the SOW leaves intact the foregoing requirement in MSA § 3 that ST's payment of

invoices is contingent upon the invoice *being submitted in accordance with the applicable*

*Statement of Work*, *see* Ex. B at 31 ("[e]xcept to the extent amended by the terms of this

Statement of Work ('SOW'), this SOW is subject to and governed by the terms and conditions of

the Agreement between Customer and Consultant dated 12/17/2008," *i.e.*, the MSA).  The

parties' schedule provides for a Q3 2014 payment upon specifically listed "Conditions" and that it is a "[r]ecurring service fee" for "Crown Service Delivery."  Ex. C § 2, App. 1; *see also* Ex. B at 28 ("Fees include Crown services . . . and application support, as well as fees for Crown hosting.").  ST had no contractual obligation to pay invoices from Crown that seek an extra-contractual "Final Payment" apart from the agreed-upon service.[10]

Plaintiff brings its breach of contract claim to recover a purported "Final Payment" under the SOW as amended by the Amendment.  Am. Compl. ¶¶ 22, 25, 34.  This special designation for the tenth quarterly fee utterly ignores that the payment schedule in Section 2 of the Amendment lists the same "Conditions" for the Q3 2014 payment as the preceding quarters:  it is a "[r]ecurring service fee."  Ex. C § 2.  The SOW similarly makes clear that these fees cover *ongoing services* Crown is to provide for ST.  The agreements therefore unambiguously provide that the Q3 2014 payment, like the up-front quarterly payments that precede it, is conditioned upon Crown's performance of the recurring services specified in the SOW and Amendment.  Accordingly, Plaintiff's breach of contract claim fails as a matter of law and should be dismissed.

---

[10] In addition, Plaintiff's claim fails because the Amended Complaint does not, and cannot, allege "due performance" by Crown of its obligations under the agreements.  *See DLJ Mortg. Capital Inc. v. Home Loan Corp.*, 667 F. Supp. 2d 368, 368 (S.D.N.Y. 2009) (Marrero, J.) (to recover on a claim for breach of contract a plaintiff must allege "(1) the existence of a valid contract; (2) due performance by the plaintiff; (3) breach by the defendant; and (4) damages to defendant caused by the breach").  Section 2 of the Amendment unambiguously lists each $438,000 quarterly payment as a "[r]ecurring service fee."  Crown did not perform, and indeed refused to perform, the recurring service for Q3 2014 that ST contracted for under the SOW and Amendment, and therefore cannot make out a breach of contract claim against ST by alleging breach of that same agreements.  *See Jasper & Black, LLC v. Carolina Pad Co., LLC*, No. 10 CIV. 3562 LTS HBP, 2012 WL 413869, at *9 (S.D.N.Y. Feb. 9, 2012) ("Because J & B has failed to adequately allege its own due performance of the Agreement, its breach of contract claim as currently asserted against Libretto fails."); *R.H. Damon & Co. v. Softkey Software Prods., Inc.*, 811 F. Supp. 986, 991 (S.D.N.Y. 1993) (dismissing breach of contract claims because "the complaint must contain some allegation that the plaintiffs actually performed their obligations under the contract").

## II.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM MUST BE DISMISSED

To set forth a claim for unjust enrichment under New York law, plaintiffs must allege:  (1) that the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances were such that equity and good conscience require the defendants to make restitution.  *See, e.g.*, *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 519 (2d Cir. 2001).

Unjust enrichment is a claim sounding in quasi contract and, as a matter of law, cannot be maintained when there is a contract between the parties governing the subject matter at issue.  *See Schultz v. Gershman*, 68 A.D.3d 426, 427 (1st Dep't 2009) ("Plaintiffs' unjust enrichment cause of action is barred by the existence of the contract between the parties."); *Goldstein v. CIBC World Markets Corp.*, 6 A.D.3d 295, 296 (1st Dep't 2004) ("A claim for unjust enrichment, or quasi contract, may not be maintained where a contract exists between the parties covering the same subject matter.  Here, plaintiff's claim is 'indistinguishable from the breach of contract claim.'") (citations omitted); *see also Georgia Malone & Co., Inc. v. Rieder*, 86 A.D.3d 406, 408 (1st Dep't 2011) ("Unjust enrichment is a quasi-contract theory of recovery, and 'is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned'") (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009)).

Plaintiff alleges that ST has been unjustly enriched by "serviced provided by Crown" and "should be required to pay Crown an additional amount of at least $438,000 for the services that Crown provided," Am. Compl. ¶¶ 37-38.  But these are the exact services— governed by, and to be provided pursuant to, the SOW and Amendment—that are the basis for Plaintiff's breach of contract claim premised on identical facts.  *Compare id.* (purporting to allege unjust enrichment) *with id.* at ¶ 34 (alleging breach of contract whereby "Crown has been

damaged in the amount of $438,000 by reason of [ST]'s failure to pay the invoice for the Final

Payment.").  Moreover, Plaintiff "do[es] not dispute that written agreements cover the claims."

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, No. 14-CV-2197 VM, 2014 WL

4447298, at *6 (S.D.N.Y. Aug. 27, 2014) (Marrero, J.) ("even though the Court dismissed the

parallel breach of contract claim, dismissal of the unjust enrichment claim is still proper because

the contracts governing the instant dispute were valid and enforceable").  As such, Plaintiff's

unjust enrichment claim must be dismissed.

### CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Amended

Complaint with prejudice.


Dated:  New York, New York                  Respectfully submitted,
            November 20, 2014


                                            SIDLEY AUSTIN LLP

                                            By:   */s/ Benjamin F. Burry*
                                                John J. Kuster
                                                Benjamin F. Burry

                                                787 Seventh Avenue
                                                New York, New York 10019
                                                Tel:  (212) 839-5300
                                                Fax:  (212) 839-5599
                                                jkuster@sidley.com
                                                bburry@sidley.com

                                                *Attorneys for Defendant*
                                                *STMicroelectronics International N.V.*